IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Illinois Tamale Company, Inc. d/b/a Iltaco, an Illinois corporation, | Case No. |
| Plaintiff, | Judge |
| v. | JURY TRIAL DEMANDED |
| LC Trademarks, Inc., a Michigan corporation, and Little Caesar Enterprises, Inc., a Michigan corporation, | |
| Defendants. | |

**PLAINTIFF ILLINOIS TAMALE COMPANY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**I.    INTRODUCTION**

Plaintiff Illinois Tamale Company, Inc. d/b/a Iltaco, maker of the iconic Chicago food, the Original Pizza Puff, hereby moves for a preliminary injunction to prevent LC Trademarks, Inc. ("LC Trademarks") and Little Caesar Enterprises, Inc. ("Little Caesars") from continuing to sell products under the Crazy Puff name or any other name confusingly similar to Iltaco's Puff Marks.

Iltaco is a family-owned, Chicago-based food company established almost a century ago in 1927. Since 1976, Iltaco has been selling a food product known as the Pizza Puff and other variations of "Puffs". Iltaco vigorously protects its brand and owns federally registered trademarks for, among other things, PIZZA PUFF and PUFF in connection with the sale of its food products. Recently, Defendants introduced the "Crazy Puff" product, even referencing the product as a "pizza puff" on its website (collectively, "Crazy Puff" and "Pizza Puff" as used by Defendants are referred to as the "Infringing Marks").

After learning about Defendants' introduction of Crazy Puffs into the market, Iltaco immediately sent Defendants a cease-and-desist letter. After weeks of discussion between the parties, it became clear to Iltaco that Defendants were simply dragging negotiations on with no intention of stopping use of the Infringing Marks.

52410361.2

Defendants' infringement has already caused actual customer confusion and will continue to cause irreparable harm to Iltaco. Iltaco moves this court for a preliminary injunction to prevent Defendants from using the Infringing Marks until the underlying trademark case is resolved.

## II. STATEMENT OF FACTS

### A. Iltaco and the Puff Marks

Iltaco is a family-owned, Chicago-based food company established almost a century ago in 1927, when it provided tamales to the pushcart vendors in Chicago's financial district. Shabaz Decl. ¶ 2. Since its inception, Iltaco been known for providing high-quality, delicious food. In 1976, Iltaco introduced its flagship Pizza Puff, which has since become an iconic Chicago food and is now sold all over the country. *Id.* at 7 Over the years, Iltaco has expanded its product offerings to include a variety of Pizza Puffs and other products incorporating the term "Puff," creating a family of "Puff" products sold under the Iltaco brand. *See e,g.*, Compl. ¶ 17.

In connection with its product offerings, Iltaco is the owner of a family of trademarks related to its products centered on the component PUFF or PUFFS, which today extends across the United States. *Id.* Iltaco has expended significant resources growing and protecting its brands, including by obtaining federal trademark registrations for its various PUFF-related marks (collectively, the "Puff Marks"), including PIZZA PUFFS and PUFFS. Many of the Puff Marks have become incontestable. Iltaco's Puff Marks include the following[1]:

---

[1] A full list is included at paragraph 17 of the Complaint.

| **Mark** | **Reg. No.** | **Reg. Date** | **Goods and Services** |
|---|---|---|---|
| Pizza Puffs | 3,628,959 | May 26, 2009 | Food package combinations consisting primarily of cheese, meat, vegetables [ and/or processed fruit; sausages; ham; cheese; cheese substitutes; processed cheese; processed mushrooms; tomato paste; pork; frozen vegetables, namely, green peppers, onions, mushroom, spinach, and/or tomatoes ]; processed vegetables; frozen entrees consisting primarily of meat, cheese or vegetables; prepared entrees consisting primarily of meat, cheese or vegetables; packaged entrees consisting primarily of meat, cheese or vegetables, frozen meat; [ meat; prepared meat; processed meat; prepared beef; eggs; poultry; chicken; turkey |
| Taco Puffs | 4,010,781 | Aug. 16, 2011 | Food package combinations consisting primarily of meat, onions, tomatoes, peppers and/or cheese in a flour tortilla; frozen and prepared entrees consisting primarily of meat, onions, tomatoes, peppers and flour tortilla; [ frozen meat; meat; prepared meat; processed meat; prepared beef; ] handheld toaster pastries, microwave pastries, frozen meals consisting primarily of beef, vegetables with cheese and without cheese; refrigerated meals consisting primarily of beef, vegetables with cheese and without cheese; stuffed sandwiches comprised of fillings enrobed in pastry or dough; sandwiches; meat pies |
| Gyro Puffs | 4,380,545 | Aug. 6, 2013 | Food package combinations consisting primarily of cheese, meat and vegetables; cheese substitutes; processed cheese; frozen vegetables, namely, onions; processed vegetables; frozen entrees consisting primarily of meat, cheese and vegetables; prepared entrees consisting primarily of meat, cheese and vegetables; packaged entrees consisting primarily of meat, cheese and vegetables; frozen meat; meat; prepared meat; processed meat; prepared beef; meat-based, cheese-based and vegetable-based fillings for dough-enrobed foods; frozen meals consisting primarily of meats, vegetable and cheese; refrigerated meals consisting primarily of meats, vegetables and cheese |

3

| **Mark** | **Reg. No.** | **Reg. Date** | **Goods and Services** |
|---|---|---|---|
| Sausage Breakfast Puff | 5,373,221 | Jan. 9, 2018 | Food package combinations consisting primarily of meat, cheese and eggs; frozen entrees consisting primarily of meat, cheese and eggs; prepared entrees consisting primarily of meat, cheese and eggs; packaged entrees consisting primarily of meat, cheese and eggs; meat-based, cheese-based and egg-based fillings for dough-enrobed foods; frozen meals consisting primarily of meat, cheese and eggs; refrigerated meals consisting primarily of meat, cheese and eggs |
| Spinach & Cheese Pizza Puffs | 5,373,223 | Jan. 9, 2018 | Food package combinations consisting primarily of cheese and vegetables; frozen entrees consisting primarily of cheese and vegetables; prepared entrees consisting primarily of cheese and vegetables; packaged entrees consisting primarily of cheese and vegetables; cheese-based and vegetable-based fillings for dough-enrobed foods; frozen meals consisting primarily of cheese and vegetables; refrigerated meals consisting primarily of cheese and vegetables |
| Pulled Pork BBQ Puff | 5,958,483 | Jan. 14, 2020 | Food package combinations consisting primarily of meat; frozen entrees consisting primarily of meat; prepared entrees consisting primarily of meat; packaged entrees consisting primarily of meat; meat-based fillings for dough-enrobed foods; frozen meals consisting primarily of meat; refrigerated meals consisting primarily of meat |
| Reuben Puff | 5,958,486 | Jan. 14, 2020 | Food package combinations consisting primarily of meat, cheese and vegetables; frozen entrees consisting primarily of meat, cheese and vegetables; prepared entrees consisting primarily of meat, cheese and vegetables; packaged entrees consisting primarily of meat, cheese and vegetables; meat-based, cheese-based and vegetable-based fillings for dough-enrobed foods; frozen meals consisting primarily of meat, cheese and vegetables; refrigerated meals consisting primarily of meat, cheese and vegetables |
| Puff | 6,716,615 | May 3, 2022 | Sandwich wraps made of flour tortilla; meat turnover; Dough-enrobed foods consisting of a dough-based wrapper with fillings consisting primarily of meats, poultry, vegetables and cheese |

4

Both PIZZA PUFFS and PUFF claim December 10, 1976, as their date of first use in commerce. PIZZA PUFFS, among other Puff Marks, is incontestable.

Iltaco spends over a million dollars annually advertising and marketing its products under the Puff Marks. *Id.* at ¶ 11. The Puff Marks are well-known and represent the source and origin of Iltaco's goods sold in connection therewith. *See* Maronick Decl. ¶ 19-22. The strength of the Puff Marks is one of Iltaco's most valuable assets. *Id.*

B. **Defendants' Use of Infringing Marks**

Defendants also own and license a valuable, well-known asset in the name Little Caesars.[2] Despite understanding the value of a well-known mark, Defendants are knowingly infringing the Puff Marks through their Crazy Puffs. According to Defendants' website, https://crazypuffsaregreatonthego.com/, Defendants introduced the Crazy Puff on or about March 11, 2024. *See* Andrew Shabaz Decl. to Complaint ("Shabaz Decl.") Ex. 17.

Iltaco learned of the Infringing Marks in early April 2024, after customers inquired as to whether Defendants' "Crazy Puffs" were associated with Iltaco. *Id.* at ¶ 3. Immediately after learning of the Infringing Marks, Iltaco sent Defendants a cease-and-desist letter, notifying Defendants of their infringement. Kuo Decl. Ex. A. Defendants responded, suggesting that they might be willing to limit the use of or stop using "pizza puffs" but did not indicate they would stop using "Crazy Puffs." *Id.* ¶ 3. Throughout the next few weeks, the parties continued discussing options to settle the matter without seeking relief from the Court. *Id.* ¶ 4. At all times throughout the parties' discussions, Iltaco demanded that Defendants stop using the Infringing Marks. *Id.* ¶ 5.

Iltaco also discovered that Defendants had filed an application to register "Crazy Puffs" with the United States Patent and Trademark Office. The USPTO registered the mark on May 14,

---

[2] On information and belief, LC Trademarks owns the trademarks licensed by Little Caesars.

2024, Reg. No. 7,389,148, for "single serving size baked pizza dough filled with cheese; single serving size baked pizza dough filled with cheese and vegetables; single serving size baked pizza dough filled with cheese and meat." To date, Defendants are continuing to use "Crazy Puffs" and "PIZZA PUFFS" in violation of Iltaco's Puff Marks

### III. LEGAL ARGUMENT

#### A. Preliminary Injunction Standard

To obtain a preliminary injunction, a plaintiff must show that it has a reasonable likelihood of success on the merits and that it has no adequate remedy at law and will suffer irreparable harm absent a preliminary injunction. *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012); *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). Once satisfied that the plaintiff has made this showing, the court also considers the irreparable harm the defendant will suffer if preliminary relief is granted balanced against the irreparable harm the plaintiff will suffer if relief is denied and the public interest in granting or denying the preliminary injunction. *Id.* The Seventh Circuit has adopted a "sliding scale" approach, meaning that "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Here, the factors demonstrate that the Court should grant a preliminary injunction prohibiting Defendants from continuing to sell their Crazy Puff product or any other products using the Infringing Marks.

#### B. Iltaco Is Likely to Succeed on the Merits

A plaintiff satisfies the first requirement if it shows that it has "some likelihood" of success on the merits. *Ty*, 237 F.3d at 896. This requires only a "better than negligible" chance of succeeding on the merits. *Id*. (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988)). Here, the likelihood of success is far more than "better than negligible," it is substantial.

At the very least, this is a clear case of reverse confusion where a "junior user uses its size and market power to overwhelm a senior, but smaller, mark user." *Wm. Wrigley Jr. Co. v. Swerve IP, LLC*, 900 F. Supp. 2d 794, 798 (N.D. Ill. 2012). The Seventh Circuit has recognized reverse

6

confusion as actionable under the Lanham Act because of the harm arising from the public coming to assuming that "the senior user's products are really the junior user's or that the former has become somehow connected to the latter." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992). "'The result is that the senior user loses the value of the trademark— its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.'" *Id.* (quoting *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)).

To succeed on the merits of a trademark action, a plaintiff must prove (1) that it has a protectable trademark, and (2) a likelihood of confusion as to the origin of the defendant's product. *Id.* at 897. Iltaco owns fourteen (14) federal registrations for marks incorporating PUFF. Many of these, including PIZZA PUFF, are incontestable. Thus, Iltaco has protectable trademark.

To establish a likelihood of confusion, courts consider: (1) the similarity of the marks, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of customer care, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's." *Holbrook Mfg. LLC v. Rhyno Mfg. Inc.*, 497 F.Supp.3d 319, 331 (N.D. Ill. 2020). Although courts consider a variety of factors, "the most important are the similarity of the marks, the intent of the claimed infringer, and evidence of actual confusion." *Roadget Bus. PTE. v. PDD Holdings Inc.*, 1:22-cv-07119 (N.D. Ill. July 31, 2023) (quotation omitted).

### 1. Defendants' Infringing Marks are confusingly similar to the Puff Marks

Defendants are using "Crazy Puffs" and "PIZZA PUFFS"[3] to sell their product. "PIZZA PUFFS" is a direct copy of Iltaco's PIZZA PUFF mark that has been registered since May 26, 2009, and there is no question Defendants' use of "PIZZA PUFFS" is confusingly similar. Moreover, despite their use of "CRAZY PUFFS" as the product name, Defendants regularly

---

[3] Defendants have suggested that their use of "PIZZA PUFFS" is fair use. But their prominent display of the term on the product's website belies that suggestion. *See, e.g.*, Shabaz Decl. Exs. 17, 21. Moreover, as discussed below, Iltaco's PIZZA PUFFS is a strong mark and is not descriptive of any particular type of product.

refer to the product as PIZZA PUFFS, and consumers do as well. *See, e.g.*, Exs. 18-35.

Defendants' use of "Crazy Puffs" likewise is confusingly similar. Since 1976, Iltaco has established itself as a seller of Puff-related food products, including multiple iterations of Puffs, e.g., Gyro Puff, Taco Puff, etc. That Iltaco has not made or sold a "Crazy Puff" does not prevent such confusion because the Puff family of marks, *i.e.*, PUFF itself, is protected. A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates the common characteristic of the family with the trademark owner. *J & J Snack Foods Corp. v. McDonalds, Corp.*, 932 F. 2d 1460, 1462 (Fed. Cir. 1991). Recognition of the family is achieved when the pattern of usage of the common element is sufficient to be indicative of the origin of the family, and may be shown through the use, advertisement, and distinctiveness of the marks, including assessment of the contribution of the common feature to the recognition of the marks as of common origin. *Id*. at 1463.

Iltaco's Puff Marks are a family wherein food products that include ingredients like meat, cheese, and vegetable wrapped in dough sold under the Puff mark are associated with Iltaco—just as, for example, electronic products sold under the "i" mark are associated with Apple or food products sold with the "Mc" prefix are associated with McDonalds. Defendants' Infringing Marks, "Crazy Puffs" and "pizza puffs" fall directly within that family and are confusingly similar to Iltaco's Puff Marks. Moreover, as stated, PUFF, by itself, is Iltaco's registered trademark.

  **2.  Customers have actually been confused and are likely to continue to be confused by Defendants' use of the Infringing Marks**

"Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis, this evidence is not required to prove that a likelihood of confusion exists." *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1016 (N.D. Ill. 2014). A lack of evidence of **actual** confusion is not dispositive of the **likelihood** of confusion. *Top Tobacco v. Fantasia Distribution Inc.*, 101 F. Supp. 3d 783, 792 (N.D. Ill. 2015) (citing *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001)). A plaintiff need not introduce market survey evidence of the likelihood of confusion. *See Badger*, 13 F.3d at 1153.

In just a short time since Defendants introduced their Crazy Puffs product, numerous

instances of actual confusion have arisen. Recognizing the iconic Chicago food, many consumers have expressed actual confusion as to whether the Crazy Puffs product was the Chicago-based Pizza Puffs. *See, e.g.*, Shabaz Decl. Ex. 37 ("I thought pizza puff like the one in Chicago, but it look good"); *Id.* at Ex. 38 ("When I hear pizza puff I think differently"); (Soon as I saw them I was like, that ain't no pizza puff. lol"); ("Rite I'm from Chicago like where the pizza puffs at"); *Id.* at Ex. 39 ("ME TOO! She opened the box and I was like….That is not a doggone pizza puff!!!); *Id.* at Ex. 40 ("Girl, you got us Chicagoans out here thinking you bout to pull out a real pizza puff"); *Id.* at Ex. 41 ("I'm thinking they finna be like Chicago pizza puffs"); ("Pizza puffs??? What is this"); ("I thought it was a Chicago pizza puff"); ("I thought this was gon b a actual pizza puff"); *Id.* at Ex. 42 ("As a Chicagoan I was confused because that ain't a pizza puff but definitely will be trying"); ("I thought it was a pizza puff fr #chicagoan"); ("Now I want a REAL pizza puff, from Chicago!"); ("That's not a pizza puff");

Other consumers suggested they were trying the Crazy Puffs based on their familiarity with the iconic Pizza Puffs or they believed that Crazy Puffs would be the same as Iltaco's Pizza Puffs. *See e.g.*, Shabaz Decl. Ex. 1 ("Them lil Caesar's pizza puffs just aight to me. Chicago style pizza puff 10x better idk what I was expecting"); *Id.* at Ex. 2 ("right cool.. but as a chicagoan, these are not pizza puffs wtf?"); *Id.* at Ex. 3 ("Soo it was good I give it a 8/10. But Chicago pizza puffs are wayyyy better"); *Id.* at Ex. 4 (responding to post about Little Casears "pizza puffs": "These ain't pizza puffs"); *Id.* at Ex. 5 ("No way pizza puffs are finally coming out of Chicago, take them back here it the only thing I gate keep online"); *Id.* at Ex. 6 ("responding to post about Little Casears "pizza puffs": "Those aren't pizza puffs"); *Id.* at Ex. 7 ("As a Chicago n****, we not about to call them lil Cesar joints pizza puffs. Absolutely the f*** not"); *Id.* at Ex. 8 ("We finally found out the name of these little sh*** "pizza puffs" how y'all feel about the name?"); *Id.* at Ex. 9 ("responding to post about Little Casears "pizza puffs": "These are not pizza puffs" and posting a meme stating:

"It's anti-Chicago discrimination"); *Id.* at Ex. 10 ("responding to post about Little Casears "pizza puffs": "These are not pizza puffs"); *Id.* at Ex. 11 ("i don't like how little caesar's callin them things pizza puffs"); *Id.* at Ex. 12 ("Yall keep saying pizza puffs and every single time I keep thinking of a pizza puff from Chicago lmao"); *Id.* at Ex. 13 ("Been looking for Pizza Puffs since I moved out of Chicago, @littlecaesars you have a friend in me (in my Woody voice); *Id.* at Ex. 14 ("while they look decent, those are not pizza puffs & as a chicagoan i am offended."); *Id.* at Ex. 15 ("I want people to actually try pizza puffs like the Chicago pizza puffs with a lil lemon pepper on it if we gonna go full big back"); *Id.* at Ex. 16 ("Those Little Caesar pizza bites (i can't call them pizza puffs because I'm from Chicago and those are nowhere near pizza puffs) were good w/ that crazy sauce; gotta get the crazy sauce with them."

### 3. The parties sell similar goods

The plaintiff's and defendant's products are considered similar in type, if the buying public would reasonably think they come from the same source, or are affiliated with, connected to, or sponsored by, the same source. *Ty*, 237 F.3d at 900; *Top Tobacco*, 101 F. Supp. 3d at 790; *KJ Korea*, 66 F. Supp. 3d at 1015. Here, Iltaco's products sold under the Puff Marks are the same types of goods as Defendants' Crazy Puffs product. Both incorporate dough filled with meats, cheese, and vegetables. *Compare* Reg. Nos. 3,628,959 and 6,716,615 *with* Reg. No. 7,389,148. And Iltaco's most prominent, long-standing Puff Mark is the Pizza Puff, which includes many of the exact same pizza ingredients as Defendants' Crazy Puffs. Thus, this factor further supports the conclusion that the buying public is likely to think Defendants' Crazy Puff product and Iltaco's products sold under the Puff Marks are associated or originate from a common source.

### 4. Defendants' Crazy Puff product and Iltaco's products sold under the Puff Marks are sold in the same area and used in the same manner

Under this factor, courts consider the products' geographical areas of distribution; whether the products directly compete with each other; whether products are sold to consumers in the same type of store; and whether the products are sold through the same marketing channels. *Top*

10

*Tobacco*, 101 F. Supp. 3d at 790–91. Facts supporting this factor include both products being advertised nationwide (*KJ Korea*, 66 F. Supp. 3d at 1016); both products being sold in the same city (*id.*); both products being sold in the same type of retail stores or same sections of stores (*Top Tobacco*, 101 F. Supp. 3d at 791).

Here, the Iltaco products and Defendants' Crazy Puffs are both advertised for and sold nationwide and many overlapping cities, including Chicago. Maronick Decl. ¶ 15. Iltaco markets and sells its product through multiple channels, including grocery stores, convenient stores, and restaurants. *Id.* It appears Defendants sell Crazy Puffs at Little Caesars restaurants and online for delivery or pickup. *See* Shabaz Decl. Ex. 17. That both parties sell their Puff product through one of the same channels—restaurants—increase the likelihood of consumer confusion. *See Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 739 (7th Cir. 2013) (affirming grant of preliminary injunction preventing defendant from selling product given that the likelihood of confusion arising from "similar products with confusingly similar trade names [being] sold through the same distribution channel—grocery stores"). Moreover, Defendants have created an entirely separate website for their Crazy Puffs, suggesting they are "great on the go" and that they are "hot-n-ready" which is another manner in which Iltaco's products are also marketed and sold—online, and for on the go. *See* Shabaz Decl. Ex. 17; Ex. 21.

### 5. The consumer's degree of care

The lower the degree of care, the higher the likelihood of confusion. *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993) ("[C]onsumers take less time purchasing low-cost items, and haste increases the possibility of confusion."). Both Iltaco's Puff products and Defendants' Crazy Puffs product are low cost and subject to a low degree of consumer care. Shabaz Decl. ¶¶ 5-6, Ex. 21; *see also, e.g.*, *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987) (agreeing with district court's analysis that the degree of care by Little Caesar's consumers was low) Maronick Decl. ¶ 17. Furthermore, given the strength of the Puff Marks, as discussed below, a consumer that sees "Puff" on a product that includes dough, meat, cheese, and vegetables is unlikely to undertake further inquiry and would assume its association with the Iltaco family of "Puffs."

### 6. The Puff Marks are strong

To determine the strength of the plaintiff's trademark, courts "examine the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Top Tobacco.*, 101 F. Supp. at 791. Here, the Puff Marks are strong. Iltaco has been a Chicago company for almost a century with the Puff brand becoming a household name back in the 1970s. Consumers and others recognize Iltaco's products sold under the Puff Marks. Indeed, numerous writings have expressly recognized "Pizza Puff" as a brand of product. For example, one food writer stated "Chicago-based Iltaco Foods exclusively manufactures [pizza puffs] and distributes them to retail outlets and restaurants." Shabaz Decl. Ex. 43. Yet another food writer stated "[b]y most accounts, pizza puffs were invented by Iltaco Foods, who to this day remain the sole purveyor of the pizza puffs you'll encounter in a retail or restaurant setting." Shabaz Decl. Ex. 44. The Chicago Tribune has written "When you order a pizza puff, unless the establishment makes its own, a real rarity, you're undoubtedly eating one produced by Iltaco Foods on the West Side." Shabaz Decl. Ex. 47; *see also* Exs. 45-46.

Indeed Iltaco has previously prevailed on a trademark infringement case related to the "Puffs" family of marks. *See Illinois Tamale Co. v. El-Greg, Inc.*, 2019 WL 4395139, at * 8 (Sept. 13, 2019). In that case, the court noted that the jury could have relied on survey evidence showing that consumers connected "Puffs" products with Iltaco's products and other evidence showing that Iltaco had used the term "Puffs" continuously since the late 1970s or early 1980s; Iltaco had sold its products at restaurants and retailers since that time; Iltaco had advertised its "Puffs" products together, including on price sheets, since the 1980s; and the "Puffs" products had an established market presence. *Id.* at *8.

Other relevant evidence as to the strength of the mark includes the amount of advertising and the amount of sales. *See Top Tobacco*, 101 F. Supp. 3d at 791; *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F.Supp.3d 1005, 1016 (N.D. Ill. 2014). Iltaco spends significant time, effort, and resources, including more than $1 million each year, to advertise and market the various products it sells under the Puff Marks. Shabaz Decl. ¶ 11. This includes advertising and marketing both to consumers and other businesses. *Id.* Finally, that Defendants registered CRAZY PUFFS with the

12

USPTO suggests they believe the Puff family of marks are strong—they would not have registered their own mark if it was merely generic or descriptive.

### 7. Defendants' intent is unknown at this time

Although it is unclear whether Defendants rolled out the Infringing Marks intending to palm off Iltaco's Puff Marks, it is clear now that Defendants are continuing to infringe Iltaco's Puff Marks with full knowledge of their infringement. Moreover, Defendants were undoubtedly aware of the Puff Marks because the USPTO cited examples of them in requiring Defendants to disclaim "Puffs" when they registered "Crazy Puffs." As requested below, Iltaco seeks expedited discovery on this issue.

An overall weighing of the likelihood-of-confusion factors make clear, however, that the consuming public is likely to confuse the Infringing Marks with Iltaco's Puff Marks, including among others, the incontestable Pizza Puff. Thus, Iltaco is likely to succeed on the merits.

### C. **Iltaco Will Suffer Irreparable Harm Absent a Preliminary Injunction**

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Luxottica USA LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule "A,"* 2015 WL 3818622 (N.D. Ill. 2015), citing *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001). Irreparable injury "almost inevitably follows" when confusion is likely because such injury "may not be fully compensable in damages." *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1332 (7th Cir. 1977) (citation omitted).

If a preliminary injunction is not granted, Iltaco will suffer loss for which there is no adequate remedy at law because: (1) Defendants' infringement connects Defendants' Crazy Puffs to genuine products sold by Iltaco under the Puff Marks; (2) Defendants' use causes consumers to be confused regarding whether the Crazy Puffs product is affiliated with or sponsored by the Iltaco; (3) Iltaco has no control over the manufacturing or quality control of Defendants' Crazy Puffs product and thus, any quality problems related to Defendants' products would be attributed to Iltaco, resulting in damaged goodwill and lost sales; and (4) the ongoing advertising and sale of the Crazy Puffs product by Defendants decreases the distinctiveness of the Puff Marks.

As detailed above, Iltaco has made substantial investment in–and succeeded in–establishing its significant reputation and goodwill in its own brand name a century ago and in the Puff Marks beginning almost 50 years ago. Defendants have hijacked that reputation to sell directly competing products over which Iltaco has no control. Iltaco has honed the Puff Marks over decades to be strongly associated with the reputation and goodwill Iltaco has spent a century building. "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *Int'l Kennel Club*, 846 F.2d at 1092. Defendants' willful usurpation of the Puff Mark brands has seized Iltaco's ability to control its own reputation and brand, leaving Iltaco to suffer ongoing irreparable harm.

The risks to Iltaco and its reputation are manifest, and imminent. Iltaco employs rigorous quality controls over the products it sells under the Puff Marks. Shabaz Decl. ¶ 12. But Iltaco has no control over the quality of Defendants' competing products, calculated to confuse the public into believing that the parties' respective goods come from a single source.

D. **The Balance of Harms Weighs in Favor of a Preliminary Injunction**

The irreparable harm to Iltaco is described above. In the absence of an injunction, Iltaco will be significantly prejudiced, because it will lose the value of its most valuable asset—its brand. The net result will be damage to Iltaco in the form of lost profits, reputation, and goodwill, which amount cannot be measured or compensated by monetary damages alone. Further, unabated infringement will encourage others to use Iltaco's intellectual property without a license, despite Iltaco having vigorously invested in and protected its Puff Marks.

Comparatively, the potential harm to Defendants is insignificant. As the Seventh Circuit has explained in affirming a preliminary injunction preventing a large junior user who sells many products other than the one bearing the infringing mark from selling its product in the same channels as the senior user:

> Irreparable harm is especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion (and the interval between the filing of a trademark infringement complaint and final judgment is sure not to be trivial). And on the other side of the ledger, there is no information on how many new customers [Infringer] can expect to obtain by selling through grocery stores, given that it already sells its food

> products at its country stores and on its website. So there is no basis for concluding that it is losing heavily as a result of not being able to sell through grocery stores until and unless it obtains a final judgment in its favor.

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013)

Here, Defendants will simply be prevented from willfully infringing the Puff Marks and from trading on Iltaco's goodwill – actions Defendants never had the right to do in the first place. *See Ty*, 237 F.3d at 903 (explaining that when assessing the harm to the alleged infringer, "the court excludes the burden it voluntarily assumed by proceeding in the face of known risk.") Thus, any financial burden alleged by Defendants should be excluded from this Court's analysis.

Moreover, Defendants' Crazy Puff product, in contrast to Iltaco, is brand new without an established market position and brand strength. An injunction barring Defendants from infringing the Puff Marks will not impede Defendants' ability to do business. Indeed, Little Caesars has hundreds of products to sell and, in fact, could continue selling Crazy Puffs—just under a different non-infringing name. Where, as here, the plaintiff has demonstrated a strong case on the merits and irreparable harm, the balance favors granting injunctive relief. *See Ty*, 132 F.3d at 1172.

E. **The Public Interest Will Be Served by Granting the Injunction**

The public interest will be served by granting Iltaco's request for a preliminary injunction. In trademark actions, the public interest favors the issuance of a preliminary injunction where it will prevent consumer confusion. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000) ("[T]he public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion."). Here, the public interest will be served by eliminating the likelihood of confusion as to the source of Defendants' Crazy Puffs. The gravamen of trademark protection is the right of the public to be free of confusion, along with the right of the trademark owner to control its reputation and its products' reputation; therefore, preventing Defendants from infringing the Puff Marks promotes the interests of the public. *See id.*.

IV. **REQUEST FOR EXPEDITED DISCOVERY**

Iltaco cannot, at this point, determine the full extent of Defendants' infringement and other misconduct without information from Defendants themselves. For the Court to have a more

fulsome record prior to a hearing on this Preliminary Injunction, Iltaco respectfully requests that the Court enter an Order requiring Defendants to produce the discovery as follows:

- Rule 30(b)(6) deposition of Defendant concerning the facts raised in this Motion;

- Production of documents related to the following:

    (1) Documents sufficient to show advertising and promotional expenditures related to Defendants' Crazy Puffs product;
    (2) Documents sufficient to show sales to date of Defendants' Crazy Puffs product;
    (3) Documents and communications relating to or referring to Defendants' first awareness and/or knowledge of any of Iltaco's Puff Marks;
    (4) All documents and communications relating or referring to Iltaco and/or any of the Puff Marks.
    (5) Documents and communications relating to or referring to the similarities or dissimilarities between the parties' respective goods.

## V. CONCLUSION

For the reasons set forth above, the Court should grant Iltaco's Motion in its entirety.

Respectfully submitted,

**SAUL EWING LLP**

Dated: June 21, 2024

*/s/ Erin Westbrook*
Joseph M. Kuo
161 N. Clark Street, Suite 4200
Chicago, IL 60601
(312) 876-7100
joseph.kuo@saul.com

Erin Westbrook
33 South Sixth Street, Suite 4750
Minneapolis, MN 55402
(612) 225-2946
erin.westbrook@saul.com

***Attorneys for Plaintiff***